### TABOR MFG. CO. v. E. H. MUMFORD CO. et al. (two cases).

(Circuit Court, E. D. Pennsylvania. May 8, 1911.)

Nos. 15, 16.

PATENTS (§ 328*)—INFRINGEMENT—MOLDING APPARATUS.

The Tabor patent, No. 533,401, for improvements in molding apparatus, the Tabor-Mumford patent, No. 582,325, for improvements in metalfounding machines, and the Tabor-Mumford patent, No. 654,292, for improvements in molding machinery, all relating to the making of sand molds for use in foundries, and covering combinations of devices intended to facilitate the withdrawal of the pattern without defacing the mold, construed, and *held* not infringed.

In Equity. ·Two suits by the Tabor Manufacturing Company against E. H. Mumford Company, Edgar H. Mumford, Rose S. Mumford, Joseph ·P. Mumford, Clifford S. Lovell, and Edwin Harrington, Son & Co., Incorporated. Suits dismissed.

John E. Hubbell and Francis T. Chambers, for complainant.
Paul Synnestvedt, for respondents.

HOLLAND, District Judge. In this controversy· there are two separate suits brought for the infringement by defendants of patents owned by complainant.

No. 15, one of the patents in suit, is the Tabor patent No. 533,401, granted January 29, 1895, to Tabor Manufacturing Company, assignor of Harris Tabor. Complainant acquired the same by mesne assignments to and from one Frederick H. Colvin. This patent will hereinafter be referred to as the "Tabor Patent."

The second patent in suit, No. 15, is No. 582,325, granted May 11, 1897, directly to complainant as assignee of Harris Tabor and Edgar H. Mumford, the inventors. This patent will hereinafter be referred to as the "Tabor-Mumford Patent."

The third patent, which is made the subject of a separate suit, No. 16, is patent No. 654,292, granted July 24, 1900, directly to the complainant as assignee of Harris Tabor and Edgar H. Mumford, the inventors. This will hereinafter be referred to as the "Tabor-Mumford Patent (1900)."

The first is for "improvements in molding apparatus"; the second for "improvements in metal-founding machines"; the third for "improvements in molding machinery."

It is charged by the complainant in both cases that the infringement is the result of a plot devised by one of the defendants, Edgar H. Mumford, to infringe the complainant's patents, and to wreck its business, and that at the time of the formation of this plot, he was a responsible executive officer of the complainant company, intimately connected with every part of the business.; that he had not only been a joint applicant and assignee to the complainant of the two last patents named, but had been a large stockholder in the complainant company, and instrumental in interesting the present holders of the controlling interest of its ·stock; that about the beginning of the year 1905 he had practically divested himself of all his stock in the complainant company, and then conspired with the other defendants to infringe complainant's patents and to wreck its business. This is denied by the defendants, and an examination of ·the proofs upon this point leads to the conclusion that while there was much friction and disagreement between the stockholders of the complainant company and Edgar H. Mumford at the time he resigned and went into a similar business on his own account, with the other defendants, his primary purpose was the ordinary one of establishing a business for profit. The defenses are invalidity of ·the patent, noninfringement, and laches of complainant. It is, however, contended that Edgar H. Mumford is estopped from raising the question of patentability of the two· last-mentioned patents because he was one of the patentees.; but, as we

view both cases, it will be unnecessary to consider this because the defense of noninfringement is amply sustained as to all of the patents in suit.

These patents have to do with molding machinery—that is, machinery for the purpose of making sand molds for use in foundries—and in making the sand molds the sand in the flask is compacted around a pattern having the form of the casting to be made in the mold, and then the pattern is withdrawn leaving a cavity in the mold. In the operation of withdrawing the pattern in the old form, there was always danger of defacing the mold by the adherence of sand to the pattern and its consequent breaking away from the mold, a thing which is peculiarly apt to occur at the edge of the mold cavity, but which may occur at any point where the sand is in contact with the pattern. A commonly used but expensive and troublesome device for preventing the breaking of the edges of the same, was the stripping plate, viz., a flat plate nicely fitted to the contour of the pattern and held on the flat face of the mold while the pattern was being withdrawn. Another plan for preventing adherence of sand to the pattern mentioned in the patent, consisted in warming the pattern when in use so as to expand it, and permitting it to cool and contract before it was withdrawn from the same. Another plan, which was commonly used by molders, was to strike with a hammer, or other device, the molder's bench on which the molds were supported, or the molds themselves, for the purpose of loosening the adhering sand from the pattern by the jar of the blow or blows, and it appears, in some instances, the jarring hammer was mechanically actuated by hand, subsequently by various other means until finally rapping mechanisms were finally actuated by power devices, as used in the Teetor patents, numbered, respectively, 397,316 and 495,570, Moore and Clark patent No. 463,160, and the pneumatic actuated rapping machine of the Crane Company—the apparatus used by the Crane Company of Chicago prior to the filing date of the patent. And here, we will state that, upon the proofs submitted, the court is convinced that the Crane Company of Chicago did use the pneumatic actuated rapping mechanism claimed to have been made and used at or about the time of the World's Fair in 1893, which was prior to the filing date of this patent, and that the proofs of the making of these rapping machines at that time is so conclusive that the court has no doubt of the fact, as claimed by the defendants, in regard to the time when the Crane Company first put this class of rapping machines into use.

This general type of machine is old in the art, as set forth in the specifications of the patent in question. It is there stated that:

"In order to illustrate my improvements and their application, I have selected a power molding machine, the general construction and operation of which is similar to that shown and described in letters patent of the United States granted to me March 17, 1891, and numbered 448,596, though said improvements may be applied to machines differently constructed."

The patentee claims that:

"The improvements consist in providing the apparatus with machines for slightly agitating the patterns with relation to the sand in the flask, in order to free the patterns from the clinging particles of sand, when the

patterns are to be withdrawn from the molds, thereby doing away with any necessity of a stripping plate."

And:

"In mounting the pattern plate upon a yielding support, in order that such agitation may be the more effective, and the molds be left· in better condition when the patterns are withdrawn."

There are other improvements with which we are not concerned. Claim 1 is the only one alleged to be infringed. It is as follows:

"In a molding apparatus, the combination of a flask-supporting frame, a pattern-holding plate independent thereof and movable laterally in a horizontal plane with relation thereto; and a power device for agitating the plate and frame relatively to each other, substantially as and for the purposes specified."

These molding machines were old and in use long prior to the application for patent No. 533,401, in which the flask supporting frame, a pattern holding plate and a power device, practically speaking, were all old in the art. The only new element introduced in the defendant's machine is the yielding support of the pattern plate resulting from the springs upon which it is set. It is described in the specification as follows:

"In order that the rapping may be more effective for the purpose described,. I prefer to mount the pattern plate upon a yielding support. Such a support is shown in Figures 1, 4, and 5, to consist of springs 33, which are placed in sockets in the head of 50, the springs bearing on their upper ends upon the frame, 47, to which the pattern plate is secured, as hereinbefore described. This yielding support for the pattern plate performs a further useful office, which will now be explained."

This improvement in making effective the rapping operation to loosen the sand from the molds by a lateral or horizontal movement of the pattern holding plate is secured in claim 1 for a pattern holding plate "movable laterally in a horizontal plane with relation thereto," that is with relation to the flask supporting frame. The validity of this patent can be maintained if it be restricted to the specific construction claimed for it at the time it was granted, to wit, the movability of the pattern holding plate in a horizontal plane, as set forth in claim 1. An examination of the history of the case through the Patent Office shows that it was granted because of this new feature. It had been refused, and the claims modified by the application so as to restrict it to the yielding support shown by the springs upon which the pattern holding plate is secured.

The defendants' machine does not have this feature. The pattern holding plate is rigidly and firmly bolted down to a frame, which in turn is securely and rigidly bolted down to upright posts that are integral with the heavier casting. So that, instead of the yielding support of the pattern plate, which is the new feature of the complainant's structure, the defendants' pattern plate is rigidly supported, as rigid as the same can be made, and not "movable laterally in a horizontal plane."

The defendants are charged with infringing claims 8 to 12, inclusive, of the patent No. 582,325. This is the Tabor-Mumford invention, and

it is essentially an improvement on the Tabor machine, which was a device primarily to provide a means for successfully drawing the patterns without the use of the expensive and troublesome "stripping plate." Stripping plates were required to fit exactly around the entire mold for the purpose of preserving the sharp edges of the mold cavity in the sand while the patterns are being withdrawn. This was a very expensive operation, and the improvement made substituted patches at various places away from the patterns. Where it was found that extra support of the sand was necessary the pattern plate was morticed, and these mortices were then filled by correspondingly shaped patches resting on the stool plate (a plate which is suspended and secured to the flask supporting frame so as to always remain in fixed position relative thereto), and free for movement through the mortices. The general idea is that, after finding points over any portion of the pattern plate which require extra support for the sand, to put a hole or mortice through the pattern plate at that point and provide a patch for such hole or mortice with its upper surface in position to support the sand at this point when the pattern separates from the sand; but all these patches are morticed in the pattern plate so that the patch plate is in such a position that its "edges are entirely away from the edges of the pattern."

All of the claims 8 to 11 are practically the same, and are all restricted to the feature that the patch plates are "away from the margins of the patterns."

The defendants' machine does not infringe claims 8, 9, 10, or 11, because the defendants in its structure uses a modified form of the stripping plate, bringing the straight edges of each patch or plate to accurately and practically coincide with the adjoining straight portion of the periphery of the pattern. In other words, the complainant's patches are "away from the margin of the patterns," and the defendants' coincide with the margin of the patterns.

As to claim 12, we do not think there is any similarity at all in the guard strips used by the complainant and defendants, and we find no infringement.

In the second suit, the bill charges an infringement of claims 9, 10, and 11 of the Tabor-Mumford patent (1900) No. 654,292. These claims are as follows:

"9. The combination of a mold-frame, a pattern, a pattern carrier, a vibrator, and means for maintaining said carrier and pattern in parallelism with themselves and for preventing lateral motion of translation thereof during the drawing of the pattern and the operation of said vibrator, substantially as described.

"10. The combination of a mold-frame, a pattern, a pattern carrier, a vibrator connected to said carrier, and means for maintaining said carrier and pattern in parallelism with themselves as the pattern is drawn and for preventing lateral motion of translation of the carrier and pattern during the operation of the vibrator, substantially as described.

"11. The combination of an open or half-mold frame, a pattern carrier, a vibrator connected with said carrier, and means for maintaining said carrier and pattern in parallelism with themselves as the pattern is drawn and for preventing lateral motion of translation of the carrier and the pattern during the operation of the vibrator, substantially as described."

The evidence of the experts shows that all the elements of this patent are old, and that the only novel feature is the "improvements· for maintaining said carrier and pattern in parallelism with themselves and for preventing lateral motion of translation of the carrier and the pattern during the operation (i. e., the drawing of the pattern) and during the operation of the vibrator." And in order to accomplish this and to avoid tilting, "long, close fitting V-shaped bearings" or guides were used; but it is insisted that the language of claims 9, 10, and 11 is sufficiently broad to cover round "long, close fitting bearings." Even if this be so, we do not think that the defendants' device, as constructed, infringes any of these claims, because it is the guide old in the art, and does not have the function of preventing tilting of the plate when the withdrawing operation is taking place, and this is established by one of the complainant's witnesses, ·in answer to this question:

"Please examine this plate, marked 'Complainant's Exhibit,' defendants' machine, and state whether or not, in your opinion, the short bearing in this plate would serve the purpose of V-shaped pins? Answer: No, it would not."

As the defendants' machine lacks the only novel function of the complainant's patent upon which the patent was granted, the short bearings or short guides in the defendants' machine failing to answer the purpose of the novel feature and being old in the art, is not an infringement.

The conclusion of the court is that the defense set up by the defendant of noninfringement of claim 1 of the Tabor patent, No. 533,401, and of claims 8, 9, 10, 11, and 12 of the Tabor-Mumford patent, No. 582,325, and of claims 9, 10, and 11 of the Tabor-Mumford patent (1900), No. 654,292, is, in every instance, sustained, and both suits are dismissed at the cost of complainant.